UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| CECORT REALTY DEVELOPMENT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HONORABLE ISABEL LLOMPART-ZENO, individually and in her official capacity as Administrative Director of the Puerto Rico Courts Administration Office,<br><br>Defendant. | Civil No. 3:15-cv-01335 (JAF) |

**MEMORANDUM OPINION AND ORDER**

This case involves a 42 U.S.C. § 1983 claim by a one-man corporation that is the owner of two high-rise buildings leased to the Puerto Rico Judicial Branch. The lease agreement was subscribed on April 14, 2000, by the then Director of the Office of Courts Administration of Puerto Rico and Cecort Properties & Services Corporation, the one-man corporation owned by attorney César Cortés-García (hereinafter, "Lease Agreement").[1] The negotiations that led to the contract entailed Cecort Properties purchasing a plot of land where the corporation would construct two buildings. One building was intended to house the Puerto Rico Circuit Court of Appeals (hereinafter, "Court of Appeals") and its thirty-nine authorized appellate judgeships. The second building would be the seat of the Office of Administration of the Courts of Puerto Rico.

[1] The parties introduced the Lease Agreement in the Spanish language as Joint Exhibit 1. The English translation is located at Docket No. 41-1.

(Hereinafter referred to as "OAT" for the Spanish name Oficina de Administración de los Tribunales.)

The § 1983 claim by Cecort Realty Development, Inc.[2] (hereinafter referred to as "Cecort") against the present Court Administrator, Superior Court Judge Isabel Llompart-Zeno, claims deprivation of property rights, the taking of property without due process of law, and a host of other claims as a result of the cancellation of the Lease Agreement after the conclusion of the first ten-year period of a contract that the Administrator of the Courts had the right to extend for two additional periods of ten years each, for a total occupancy possibility of thirty years. Notice of nonrenewal was due to Cecort 360 days before the conclusion of the first ten-year period.

This is the type of case in which judges, state or federal, find no professional satisfaction when diving into the controversy that requires decision making. It involves the location of the home of Puerto Rico's second most important appellate tribunal after the Puerto Rico Supreme Court. For years before the appellate tribunal's creation in its present form in the year 2003, it struggled to conduct business in locations less than favorable or deserving of a Court of Appeals. Indirectly, the Judges of that Court of Appeals are some of the unnamed third-party victims and sufferers of this controversy. The decision by the OAT to cancel the lease based on certain Puerto Rico Comptroller's findings, complicated with the dire insolvency of the local government, has resulted in

[2] On June 29, 2001, Cecort Properties & Services Corporation transferred title of the site where the project was to be constructed to Cecort Realty Development, Inc., another one-man corporation owned by César Cortés-García, and assigned to Cecort Realty all of its rights and obligations under the lease agreement. (Docket No. 1 at ¶13.) The OAT consented to the assignment and assumption of obligations by Cecort Realty. (Docket No. 24 at ¶13.)

the rushed and difficult plan to move to a 40-plus year old run-down building once the home office of The Western Bank of Puerto Rico which had failed by insolvency and was now in the hands of a governmental entity.

The Court of Appeals and the OAT will suffer the consequences of a hurried, unpleasant relocation. A judicial institution deserves better than that. There is another non-objective party, the one-man corporation Cecort, all because under law and contract, there is only one way to proceed; the law must be adhered to. When even well-intended actions result in contradiction to the order of law, societal norms require that the law prevail irrespective of foreseen or never anticipated consequences.

Before proceeding any further, we find that the court has jurisdiction, even to eventually dismiss the § 1983 complaint on the merits. We find that the Lease Agreement suffers from the effects of nullity. We also find that in addition to being null and void, the contract was properly cancelled by the OAT Court Administrator on account of the comptroller's findings and contractual clauses. We find that Cecort pleaded the federal complaint in a way that adequately invoked federal jurisdiction only to lose on the merits.

**How it all Started**

In or about 1999 or 2000, Attorney César Cortés-García, an entrepreneur involved in real estate, got wind that the Puerto Rico courts had interest in securing recently-built facilities in conformity with court design guidelines for both the Puerto Rico Circuit Court of Appeals and the OAT. Cortés established some personal contacts and seeing a business opportunity, located a vacant lot in the Hato Rey area that was available for

purchase. Cortés, through his one-man corporation Cecort Properties, entered into a preliminary agreement with the OAT Administrator to construct two adjacent buildings with parking facilities in the vacant lots available for sale. He then proceeded to purchase the lots and hire an architect, Antonio Suárez, who would meet with court personnel, study their needs, and design the buildings. These structures would be leased to Puerto Rico Courts for a period of ten years, giving the courts two renewal options for two extra terms of ten years each, for a total potential occupancy of thirty years.

Cortés attempted to establish during his testimony that the existence of a so-called "pre-contract" and later the Lease Agreement,[3] were creatures fathered solely by the OAT, but later he admitted to having participated fully in the negotiation of the terms of the Lease Agreement and that the agreed-upon terms were reduced to final form, that is, typed and printed as a final document at the offices of OAT. Contrary to the impression Cortés tried to create at the federal hearing, this was not an adhesion contract placed on the table by the OAT on a "take it or leave it" basis. César Cortés-García is a seasoned businessman, and he was the face and force behind the offer to build to specification and lease the constructions to the Puerto Rico Courts.

Cortés placed great emphasis in the first ten-year term and throughout his testimony and demeanor, omitted much reference to the thirty years, trying to distance himself from the purpose behind the division of the contract into three ten-year terms. Under law and regulations, any contract of such magnitude, where two tailor-made buildings are to be erected for a special tenant, would have required a bidding process

[3] We have only received in evidence the Lease Agreement and its four addendums.

because public funding was involved, and a thirty-year term was part of the agreement. The Lease Agreement contemplated a deal that would place the Court of Appeals and the OAT in the specifically-designed buildings for a period of thirty years. No one, including César Cortés-García, can reasonably say that the intent was just to have a ten-year lease. Instead, by presenting the deal as a ten-year contract with renewable terms, a dice was rolled stretching the regulations, or interpreting them conveniently, to avoid public bidding. For all purposes, the transaction was intended to hopefully last thirty years, producing rent per square foot of office space and parking space far exceeding the going prices for prime real estate in the Hato Rey area of San Juan. Eventually, these three ten-year terms of the contract, the combination of term of years and public cost, were the object of adverse findings by the Comptroller of Puerto Rico. On the OAT's side, the then Administrator of Courts testified that she proceeded to accept the terms and sign the contract relying in good faith on a legal opinion that the OAT's internal legal division issued, vouching for the legality of the terms and conditions.

The financing of this major project was all arranged by César Cortés-García and his companies, Cecort Properties & Services Corporation and Plaintiff Cecort. The architectural design was contracted and paid for by Cortés/Cecort. In addition to the site in controversy, Cortés owns a building in Utuado, Puerto Rico, and leases the property to the Courts, which houses the Court's operation in that Judicial Region.

Eventually, the project started and was finished in two phases. The first phase consisted of constructing the building that would house the Court of Appeals. That building was finished and accepted on July 13, 2003. The second phase contemplated

completing the project by erecting the smaller building that would house the OAT. This second building was finished, delivered, and accepted by OAT on June 1, 2005. Some change orders were placed by the OAT and the Lease Agreement contains four addendums that reduce to writing the various changes and adaptations that were requested and made before 2005. After 2005, both the Court of Appeals and the OAT occupied the whole complex and rent due and owing was faithfully paid every month by the OAT to Cecort.

**The Comptroller's Report DA-12-52 of March 19, 2012**

In the year 2012, the Comptroller of Puerto Rico reviewed the transaction between the OAT and Cecort and charged a number of substantial adverse findings. The salient ones are the following:

**Finding 1: Preliminary lease agreement for the spaces to be used by the Judicial Branch were granted to a private corporation without complying with the bidding process or required by regulators and the final contract related to that lease did not protect OAT's interests.**

**Finding 2: Rental fee agreed to in the lease contract for the OAT and Court of Appeals buildings exceeded the reasonable rates paid in the market.**

After the issuance of the Comptroller's Report, the Cecort transaction caught the attention of the Puerto Rico Supreme Court. *See Maranello, Inc., et al v. OAT*, 186 P.R.Dec. 780 (2012). Justice Pabón-Charneco commented negatively about the transaction in a dissenting opinion. *Id.* at 826.

Later, on November 12, 2014, the Puerto Rico Supreme Court once again tackled the issues surrounding the Lease Agreement, including the lack of bidding process and

the excessive rent. *See In re: Regulation for Judicial Branch No. ER-2014-3*, 2014 TSPR 135. There, the Supreme Court of Puerto Rico ordered the OAT to proceed with revamping the bidding regulations within six months. On that occasion, Justice Pabón concurred expressing:

> Since I find that the Decision being certified today represents another necessary measure to build new paths in the administration of the Judicial Branch, I agree with it. I am comforted by the knowledge that although two (2) years have gone by since I issued a Dissenting Opinion in *Maranello et al. v. O.A.T.*, 186 D.P.R. 780 (2012), where I called attention to the irregular practices that took place in the biddings that were the object of the two reports mentioned in the foregoing Decision, this Court has decided to establish a procedure to change and oversee the manner in which these matters have been handled in the past.
>
> For too long the administration of the Judicial Branch has been hiding in the dark and behind the comfort of conventionalism. It is time to shed light on the bureaucracy that has survived until now in dark hallways and to put all the cards on the table. The People have questioned this Branch and we must inevitably respond to their cry for change. In light of this scenario, we must show them that the Judicial branch will not fall prey to questionable practices and will not answer to exogenous interests that cloud the transparency of our work and hinder our constitutional function.
>
> This is so because the Puerto Rico Judicial Branch is much more than another constitutional branch of government. Our lex superior entrusts this Branch with being the entity that guarantees our citizens' civil rights, being the arbiter of the boundaries that exist between the spheres of action for the other branches of government, and being the administrator of the system of justice on the island. In light of this delicate responsibility, it is fair for the People of Puerto Rico to demand of the Judicial Branch a highly transparent management of public funds assigned to it to comply with its duties. In light of the demands of the times, we must respond in an affirmative manner to eradicate even the slightest appearance of irregularity in the management of public funds assigned to us to carry out our work, and to serve the People of Puerto Rico in a responsible manner. We cannot be co-participants in actions that continue to diminish the People's trust in their system of justice.

Following the Comptroller's Report of March 2012, the OAT began communications with Cecort regarding the Lease Agreement. On June 28, 2012, the OAT requested to meet with Cecort to discuss the Comptroller's findings. The parties held a meeting on August 14, 2012, and discussed the options and how to move forward given the Comptroller's Report. On September 12, 2012, the OAT again wrote to Cecort requesting to renegotiate the terms of the lease contract given the findings by the Comptroller. In this letter, the OAT wrote that in order to attend to the Comptroller's findings, it **must** renegotiate the rent payable to Cecort under the Lease Agreement. Additionally, the OAT informed Cecort that it was undertaking a valuation of the structures at issue, including the hiring of a property appraiser, and that Cecort should provide the OAT with any information Cecort wished to be considered in the valuation. The OAT also invited Cecort to come up with its own proposals for renegotiating the Lease Agreement.

Despite these letters and the findings by the Comptroller, Cortés testified that he had no idea that the OAT would not renew the Lease Agreement for another ten years. This incredulous testimony led to further questioning, and he then admitted that given the contents of the two letters, it was not a surprise that the OAT would either renegotiate the Lease Agreement or look for other locations for the OAT offices and Court of Appeals.

For some months following these letters, the record is silent as to the parties' communications. Counsel for the parties met on October 30, 2013, and discussed the positions of both Cecort and the OAT. On October 31, 2013, counsel for Cecort memorialized in writing Cecort's position: 1) Cecort refused to negotiate regarding the

remainder of the initial ten-year term; 2) Cecort would negotiate the second ten-year term only if OAT agreed to the change order totals from the June 2005 change order which amounted to over $1.4 million dollars that remained unpaid; and 3) Cecort expressed that the Court of Appeals building had already entered into its second ten-year term, but that Cecort was willing to negotiate the 15% increase. The OAT responded on December 2, 2013. In its email to Cecort's attorney, the OAT reiterates the necessity to renegotiate the Lease Agreement in light of the Comptroller's Report. Additionally, the OAT expressed its understanding that the ten-year term of the Lease Agreement did not begin until the date of delivery of the second of the two buildings in June 2005. The OAT also conveyed its belief that the contract was not automatically renewed, but that notice of intent to renew was required. The OAT appears to have abandoned this argument, having sent a notice of nonrenewal to Cecort on May 21, 2014.[4]

On December 15, 2014, Cecort offered the following to the OAT: 1) Parking space rent at $150 per space per month; 2) usable space rent at roughly $32.73 per square foot per month; 3) $1,400,000 payable in sixty monthly installments of $23,333.33 ($280,000 annually for five years); and 4) that the OAT dismiss its counter-claim for excess rent filed in the Puerto Rico Court of First Instance.[5] The OAT declined Cecort's offer stating that it would not agree to parking at more than $125 per space per month, and that it would need a further deduction in rent, ideally by 30%. The OAT expressed that it was considering alternative locations for both the Court of Appeals and the OAT at

[4] The court will discuss the effect of that termination letter below.

[5] By this time, Cecort had sued OAT in Superior Court of San Juan seeking a 15% increase in rent and the $1.4 Million that was the subject of the 2005 change order.

multiple times during the month of December 2014, and again in January of 2015. Cecort never presented a new formal offer to the OAT, despite being aware that the OAT was within days of signing a contract that would move the offices and the Court of Appeals to a more affordable location.

In January 2015, the OAT entered into a contract with a Puerto Rico government agency for the relocation of its offices and the Court of Appeals by June 1, 2015. On Friday, January 16, 2015, counsel for the OAT contacted counsel for Cecort to inform Cecort of the new contract. There is no dispute that Cecort was aware of the reality of this new contract by January 16, 2015, and that the OAT and the Court of Appeals would be vacating Cecort's two buildings at the expiration of the lease term, on or before May 31, 2015.

**Local Court Litigation Starts**

As already advanced, on January 29, 2014, Cecort filed a complaint against the OAT before the Puerto Rico Court of First Instance seeking an increase in the rent under the Lease Agreement and the additional amount owed for the 2005 change order. A different Administrative Director of the OAT, then Judge Sonia Ivette Vélez-Colón, moved by the Comptroller's findings, filed a counter-claim against Cecort seeking an adjustment of the rent to fair market value and reimbursement for the excess amounts paid. On May 21, 2014, while the OAT's motion to dismiss Cecort's claims pended before the Commonwealth Court, the OAT sent a letter to Cecort notifying it that the OAT would not be renewing the Lease Agreement for a second ten-year term. On October 14, 2014, the Commonwealth Court issued a Partial Judgment dismissing the

petition for the rent increase, but denying the OAT's request to dismiss the claim for money owed under the change order. Cecort appealed the decision. On April 15, 2015, the Puerto Rico Court of Appeals affirmed the Commonwealth Court's partial judgment. *Cecort Realty Development, Inc. v. Vélez-Colón*, No. KLAN201401842 (P.R. Cir. Ct. of App. April 15, 2015) (Docket No. 31-1, no official translation available); *Cecort Realty Development, Inc. v. Vélez-Colón*, No. KAC2014-0042 (P.R. Cts. of 1st Ins., S.J. Sup. Ct. May 23, 2014) (no official translation available; translation made by this court's certified court interpreter and translator will be filed).

**Federal Litigation Follows**

On March 31, 2015, Cecort filed this action against Defendant Llompart-Zeno in her personal capacity and in her official capacity as the actual Administrative Director of the OAT. The Complaint alleges that Defendant Llompart-Zeno seeks to deprive Cecort of its property rights by demanding that Cecort return the excessive rent paid over the last ten years, entering into a lease with a third party, and cancelling the Lease Agreement. Cecort alleges that these actions amount to a violation of due process and a taking of property for public use without just compensation.

**Federal Jurisdiction Over Cecort's Claims**

Before this court may proceed to review the merits of this matter, it must determine whether there is federal court jurisdiction over Cecort's claims. When federal jurisdiction is based on a federal question, the well-pleaded complaint rule "requires the federal question to be stated on the face of the plaintiff's well-pleaded complaint." *R.I. Fishermen's Alliance, Inc. v. R.I. Dept. of Environmental Management*, 585 F.3d 42, 48

(1st Cir. 2009). When we read the Complaint and take it at face value, the allegations sound like a major deprivation of Cecort's property rights by a governmental actor and that requires swift attention before the time has passed for preventing such catastrophic wrongs. Here, the OAT has rejected the Lease Agreement, plans have been made to leave the current buildings and relocate, and new contracts were negotiated and entered into. It was with great understanding for the parties' time-sensitive situation, and the public's interests in this controversy, that this court consolidated the preliminary injunction hearing with a full disposition hearing. It was necessary to expedite a full merits review in order to ensure proper disposition of this delicate matter.

Cecort alleges this court has jurisdiction under 42 U.S.C. § 1983 to prevent Defendant from depriving Cecort of its protected property rights under the U.S. Constitution. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Cecort relies upon 28 U.S.C. §§ 1331 and 1343(3) to confer jurisdiction upon this court. Under Section 1331 of the United States Code, "the district courts [ ] have original

jurisdiction of all civil actions arising under the Constitution . . . of the United States." 28 U.S.C. § 1331. Section 1343(3) states that:

> [D]istrict courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

Section 1343(3) confers jurisdiction upon this court "to entertain the constitutional claim if it [is] of sufficient substance to support federal jurisdiction." *Hagans v. Lavine*, 415 U.S. 528, 534 (1974).

The property that Cecort claims a right to is (1) a part of the rent, which the OAT deems "excessive", paid by the OAT to Cecort during the past ten years, and (2) the unexpired leases for the buildings. Cecort alleges Defendant's actions deprive it of substantive due process, procedural due process, and the takings clause.

Cecort has sufficiently pleaded jurisdiction of this court. First, it alleges that Defendant is attempting to force Cecort to return millions of dollars of rent that it has received under the Lease Agreement over the last ten years. There is clearly a constitutional prohibition against a government entity taking private property without just compensation.

Second, Cecort sufficiently plead a protected property interest in the continued performance by the OAT of its obligations under the Lease Agreement. Though commercial contracts with the government do not generally create a property interest, the case law leaves room for doing so in unique situations where the contract confers some

type of special status or entitlement. *See Wehran-Puerto Rico, Inc. v. Municipality of Arecibo*, 106 F.Supp.2d 276, 287 (D.P.R. 2000). Such is the case here. Prior to entering into the Lease Agreement, the OAT met with the architect to convey its needs and design for the two buildings. The two buildings were tailor made to the OAT's specifications at a cost of more than $80 Million, complete with two appellate courtrooms, built-in security features, custom offices, and divided parking to separate the employees from the public. As previously mentioned, it is clear that the parties to the contract intended this to be a long-term commitment, with no intent to terminate after the first ten-year term.

Accordingly, this court has jurisdiction over Cecort's claims.

Given the case currently before the Puerto Rico Court of First Instance, this court has reviewed the arguments and case law regarding abstention. Upon thorough consideration, we will not abstain from this matter. Actually, we are in complete agreement with what has occurred in state court and are not intervening with the present state of affairs in that litigation.

**Findings**

Having determined that jurisdiction is proper and abstention unnecessary, the court now turns to Cecort's motion for injunctive relief. Cecort requested that this court enjoin the OAT from leaving the properties prior to a determination on the merits before the court. Additionally, Cecort asked this court for an order that would prevent the OAT from pursuing its counter-claim against Cecort, which is currently before the Puerto Rico Court of First Instance, Superior Court, San Juan.

Given the time-sensitive issues before the court, and the fact that Cecort's Complaint lives or dies by this court's merits determination on its motion for injunctive relief, the clear path, we repeat, was to advance trial on the merits and consolidate it with the hearing on preliminary injunction. Prior to the hearing, the court notified the parties on several occasions that the preliminary injunction hearing would be consolidated under Fed. R. Civ. P. 65(a)(2) with a full merits' disposition. Counsel for Defendant Llompart-Zeno objected to the consolidation citing inadequate time to prepare a defense. However, given that the injunction hearing would require the same evidence as a trial, and that the parties have been engaged in litigation for over a year in the Puerto Rico Courts, the objection was overruled.

The parties were allowed and expected to present full coverage of all relevant issues. Prior to the trial, the parties stipulated to the admissibility of fifteen documents. (See Docket No. 33). During trial, the parties jointly admitted three additional exhibits.[6] Cecort moved to admit four additional block exhibits: Two blocks of letters between the parties' counsel regarding renegotiating the contract, letters from Cecort's bank, and an expert report from Cecort's certified public accountant. The court admitted these documents over Defendant's objections. Cecort presented testimony from five witnesses: Mercedes Bauermeister – the Administrative Director of the OAT when it entered into the Lease Agreement with Cecort, Antonio Suárez – the architect hired by Cecort to design the Court of Appeals and OAT buildings, César Cortés-García – owner of Cecort, Marta Isabel Pérez – bookkeeper for Cecort, and Pedro Morazzani – certified public

[6] Joint Exhibits 8, 9, and 10 were not on the parties' list of stipulated documents at Docket No. 33.

accountant hired by Cecort to perform an audit on the effects on Cecort resulting from OAT's nonrenewal of the Lease Agreement. Defendant Llompart-Zeno rested on the testimony and documents on the record. Both parties had a full opportunity to present any and all evidence during the trial, and both parties provided pretrial briefs to the court. Having given both parties a full opportunity to be heard on all relevant matters, the court finds as follows.

**The Lease Agreement is Null and Void**

Section 1207 of the Civil Code, P.R. LAWS ANN. tit. 31, § 3372 (1930), provides that citizens have contractual liberty with only three exceptions. The Code reads:

> The contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of the law, morals, or public order.

The Puerto Rico Constitution provides, in Section 9 of Article VI, P.R. LAWS ANN. tit. 1, art. VI § 9, as follows:

> Public property and funds shall only be disposed of for public purposes, for the support and operations of state institutions, and pursuant to law.

The Judicial Branch of Puerto Rico had, at times material to the signing of the lease agreement, two different regulations approved pursuant to law that regulate lease agreements. One regulation, Joint Exhibit 2, contemplates short-term leases. Article VI(A) 1 and 2 of the regulation defines a short-term lease contract as follows:

> (1) The short-term lease may be agreed to as short term up to a maximum of ten (10) years, renewable for ten (10) additional years. Additional terms may be stipulated by the parties.
>
> (2) The lease contracts for initial periods of more than ten (10) years are considered long term and are subject to the process of Public Bidding for

> the Judicial Branch approved on January 31, 1997, amended on April 15, 1998.

(Translation ours). In turn, the long-term lease regulation, Joint Exhibit 3, defines such agreement in Article V(A) and (B) of the regulation as follows:

> Article V General Contracting Norms.
>
> (A) The Director may sign long-term lease agreements for premises in conformity with the following:
>
> (1) Loan agreements for premises with terms of more than ten (10) years, and up to a maximum of thirty (30) years, will be considered long-term lease contracts.
>
> (2) The premises must be of new or recent construction.
>
> (B) The lease agreement must be adjudicated through the process of public bidding.

(Translation ours). The Lease Agreement, Joint Exhibit 1, defines the contract term as follows in Section 6:

> The term of the contract to be signed by the parties shall be of ten (10) years counted from the delivery of the facilities by the lessor and acceptance by the lessee. Upon expiration of the first term of ten (10) years, the contract may be renewed for an additional term of ten (10) years under the same terms and conditions, except for an increase in rent of fifteen (15) percent.
>
> Upon expiration of the second agreed term, the contract may be renewed under the same terms and conditions, except that there will be an increase in rent of eight (8) percent.
>
> If, after expiration of any of the terms, the lessee decides not to renew the contract, a communication shall issue to that effect at least three-hundred and sixty (360) days before the date of the return of the facilities.

(Translation ours).

The Comptroller's Report, DA-12-52, dated March 19, 2012, determined that the Lease Agreement between Cecort and the OAT was a long-term contract subject to bidding and that no bidding was held. This court agrees that the Lease Agreement in question cannot be considered a short-term contract. It is clearly established by the evidence and exhibits that the idea behind the transaction was to purchase land, construct two high-rise structures with their parking facilities for the use of both locations, under unique State Courts Design Guide specifications, to serve as the seat, the main office of the OAT and the Circuit Court of Appeals. No provident, forehanded, and precautious party would entertain that kind of project as a short-term solution for the Puerto Rico Courts or as a short-term investment. No seasoned, sagacious, and experienced business person would have invested $80+ Million in financing, unless there was a real expectation that the contract was to remain in force for decades.

We perceive, in the parties' position on the issue, an ambivalence that tends to proffer an interpretation that the two regulations quoted are not crystal clear as to how they differentiate a short-term contract from a long-term one, but the thirty-year total figure clearly best fits the long-term definition after considering the particularities of the contractual relationship negotiated. That indecision allows both sides to speak in terms of ten or thirty years depending on their position. But, the Comptroller of Puerto Rico defined the contract and the terms of the contract as long term. We think that the regulations confirm the logic behind the Comptroller's findings.

The terms of the contract are clear to the trained legal mind. The renewals up to thirty years give away the nature of the contract. It matches the thirty-year limit of the

long-term lease regulation. The purpose behind the contract is consistent with its clear terms. The actions of the parties, their intentions and expectations, ooze through every pore of the relationship. Even the testimony and documents in evidence clearly establish that this deal was to work and be useful and profitable only through its long-planned life.

The Comptroller of Puerto Rico, after issuing a preliminary report, and after receiving comments from the Courts -- which initially stood behind a short-term interpretation, reaffirmed its findings. The parties had a need, they each had their goals in mind: The best model, to pursue it and make the dream come true, was to enter into a tailor-made private contract with Cecort, whose promises were tempting enough to be backed up by a contract that, in light of ambiguous, imprecise language, would hopefully fit the mold of either regulation, depending on the need and interests of each party concerned.

Accordingly, although not obligated to blindly follow the Comptroller's conclusions, which the Supreme Court relied upon, accepted, and acted upon to correct, we must give the Comptroller's report the value it deserves and agree with it as the Supreme Court did. *In re Reglamento de Subastas de la Rama Judicial*, 192 P.R.Dec. ___, 2014 TSPR 135. *See also Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, ___ F.Supp.3d ___, 2015 WL 1205979 (D. Puerto Rico Mar. 16, 2015). There, a district judge in this court faced contract interpretation in the public sector vis-a-vis a Comptroller Report. Like in *Plaza Carolina*, this case fits perfectly well within the confines of the Comptroller's adverse finding, and we conclude that contracts of this

magnitude, which involve substantial public funding and investment, need to go through public bidding.

The Puerto Rico Supreme Court case law is crystal clear in pointing out that public contracts which do not follow the strict letter of the law, including public bidding, are null and void under section 1207 of the Civil Code, P.R. LAWS ANN. tit. 31, § 3372 (1930), for they infringe principles of public order in the management of public moneys. Lack of bidding is not the only circumstance that leads to nullity. Others of less economic impact are equally treated by the case law, the point being that there is no way to elude strict compliance with law and regulation, no matter how laudable the purpose is behind the contractual relationship. *See Ramiro Rodríguez Ramos v. ELA*, 190 P.R.Dec. ____, 2014 TSPR 32; *Marina Costa Azul v. Comisión*, 170 P.R.Dec. 847 (2007); *Empresas Toledo v. Junta de Subastas*, 168 P.R.Dec. 771 (2006); *De Jesús González v. Autoridad de Carreteras*, 148 P.R.Dec. 255 (1999); *Hatton v. Municipio de Ponce*, 134 P.R.Dec. 1001 (1994).

In *Ramiro Rodríguez Ramos*, decided in the year 2014 -- two years after the issuance of the Comptroller's Report, the Supreme Court expressed the following regarding government contracting, reiterating that parties contracting with any government entity without complying with the government contracting requirements run the risk of assuming losses without recourse:

> **B. Government Contracting**
>
> As to government contracts, the State has an obligation, based on a constitutional imperative, to apply the highest fiduciary and ethical principles when managing public funds. [Jaap Corp. v. Depto. Estado *et al.*,

> 187 D.P.R. 730, 739 (2013); C.F.S.E. v. Unión de Médicos, 170 D.P.R. 443, 452 (2007)]. In particular, Sec. 9 of Art. VI of our Constitution establishes that "[p]ublic properties and funds may only be used for public ends, for State's institutions functions and their maintenance, and in any event as authorized by law." Art. VI, Sec. 9, Commonwealth Const., L.P.R.A., Volume 1.
>
> In order to comply with this constitutional mandate, the Legislature has approved laws that impose fiscal and government contracting controls. Jaap Corp. v. Depto. Estado *et al.*, *supra*. That being the case, pursuant to the provisions of the Civil Code cited above, a contract between a private party and the State that fails to comply with these laws shall be null and void. Art. 1207 of the Civil Code, 31 L.P.R.A. sec. 3372. With this in mind, let us look at the legal provisions that apply to the contract before us.
>
> . . . .
>
> Thus, we have reiterated that parties contracting with any government entity without complying with the government contracting requirements run the risk of having to assume responsibility for their losses. Quest Diagnostics v. Municipio de San Juan, 175 D.P.R. 994, 1002 (2009); Colón v. Municipio de Arecibo, 170 D.P.R. 718, 728-729 (2007). This is so because we have consequently rejected the application of any remedy in equity, as would be an unfair enrichment, to validate a public obligation without [bidding], and thereby compensate for damages suffered by a private party for failure to comply with these requirements. Alco Corp. v. Municipio de Toa Alta, [183 D.P.R. 530, 552 (2011)]; Las Marías v. Municipio de San Juan, 159 D.P.R. 868, 875 (2003).

190 P.R.Dec. ___, 2014 TSPR 32 (no official translation available; partial translation made by this court's certified court interpreter and translator will be filed).

In *Empresas Toledo*, the Supreme Court of Puerto Rico stated:

> [1] The public bidding process is extremely important and invested with the highest public interest. Oliveras, Inc. v. Universal Insurance Co., 141 D.P.R. 900 (1996). On the issue of bid adjudications we have stated that "[a] government's good administration is a virtue of democracy, and part of a good administration implies carrying out its functions as a buyer with efficiency, honesty and correctness in order to protect the interests and monies of the people such government represents." A.E.E. v. Maxón Engineering Services, Inc. res. of December 9, 2004, 2004 TSPR 197; RBR Const., S.E. v. A.C., 149 D.P.R. 836, 848-849 (1999); Oliveras, Inc. v.

Universal Ins. Co., 141 D.P.R. 900, 926-927 (1996); Hatton v. Mun. De Ponce, [134 P.R.Dec. 1001 (1994)]; Mar-Mol Co. Inc. v. Adm. Servicios Gens., 126 D.P.R. 864, 871 (1990).

[2] The fundamental objective of bids is, precisely, to protect the public funds by having public works constructed and quality services acquired for the Government at the best possible prices. [...] encouraging free and transparent competition among the largest number of bidders possible such that the State gets the work done at the lowest possible price. RBR Const., S.E. v. A.C., ante; Cancel v. Municipio de San Juan, 101 D.P.R. 296, 300 (1973).

[3] The main purposes of the legislation regulating the work done and the contracting of services for the Government and the government bidding systems are precisely these: to protect the people's interests and money by promoting competition in order to get the lowest possible prices; to avoid favoritism, corruption, waste, prevarication, extravagance, and carelessness when awarding contracts, and to minimize the risks of default. See: Justiniano v. E.L.A., 100 D.P.R. 334 (1971). We have further stated that the bidding scheme prevents governmental corruption and protects public funds by guaranteeing the contracting of services from the lowest bidder. Oliveras, Inc. v. Universal Insurance Co., ante.

. . . .

[6] Bidding procedures are not regulated by a special general law. Sec. 3.19 of the Uniform Administrative Procedure Act, hereinafter, L.P.A.U., 3 L.P.R.A. sec. 2169, provides that the bidding process shall be informal and that its regulation as well as its terms shall be established by the agencies. So it is left, then, at the discretion of each agency, as the entity with the specialized knowledge, to approve regulations that establish the procedures and guidelines to be followed for their own bids. L.P.C. & D. Inc. v. A.C., 149 D.P.R. 869, 875 (1999).

168 P.R.Dec. 771, 778-80. (No official translation available; partial translation made by

this court's certified court interpreter and translator will be filed).

A concurrent opinion by Justice Rodríguez-Rodríguez expressed the following, at

page 793:

> The main objective when a public bid is adjudicated is dual, on the one hand, to have the work done at the lowest possible price, thereby avoiding favoritism, corruption, extravagance and carelessness when awarding contracts and, on the other hand, to further and safeguard the government agency's best interests. *RBR Construction v. A.C.T.*, 149 D.P.R. 836, 849 (1999); *Cancel v. Mun. de San Juan*, 101 D.P.R. 296, 300 (1973); *Justiniano v. E.L.A.*, 100 D.P.R. 334, 338 (1971).

168 P.R.Dec. 771, 793 (no official translation available; partial translation made by this court's certified court interpreter and translator will be filed).

In the case of *Marina Costa Azul*, 170 P.R.Dec. 847, Justice Fuster-Berlingeri wrote about the importance of public bidding:

> [2] It is clear that, at law, the Government of Puerto Rico has the responsibility to oversee the proper management and use of public funds. This is considered a constitutional responsibility, by virtue of the mandate stated in Section 9 of Article VI of our fundamental law; which states that "*public funds will only be used for public purposes*." The aforementioned constitutional mandate imposes upon the State the duty to ensure that the use of taxpayers' monies are always tied to the general welfare of all citizens. P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995). As part of the efforts to comply with this charge, public policy against government corruption has been established throughout the years, which is reflected in laws such as the Puerto Rico Government Ethics Act, Act No. 12 of July 24, 1985, as amended; (3 L.P.R.A. sec. 1801 *et seq.*); the Special Independent Prosecutor Act, Act No. 2 of February 23, 1988, as amended, (3 L.P.R.A. sec. 99h *et seq.*) and the new Code of Criminal Procedure, Act No. 149 of June 18, 2004 (33 L.P.R.A. sec. 4629 *et seq.*), which establishes *inter alia* that offenses involving misappropriation and embezzlement of public funds do not prescribe. (33 L.P.R.A. sec. 4727).
>
> [3] By virtue of the fundamental public policy referenced briefly in the paragraph above, we have also ruled that public auction procedures are of the utmost public interest. Empresas Toledo v. Junta, op. dated 31 August 2006, 168 D.P.R. ____ (2005), 2006 TSPR 138, 2006 JTS 147. Their main objective is to protect public funds while procuring high quality services and construction of public works for the Government at the best possible price. Justiniano v. E.L.A., 100 D.P.R. 334, 338 (1971). Furthermore, it avoids favoritism, corruption, waste, malfeasance, extravagance and carelessness when granting contracts and spending taxpayers' monies.

> A.E.E. v. Maxon, op. dated 9 December 2004, 163 D.P.R. ____ (2004), 2004 TSPR 197, 2004 JTS 199; Cancel v. Municipio de San Juan, 101 D.P.R. 296, 300 (1973).

170 P.R.Dec. 847, 853-54 (no official translation available; partial translation made by this court's certified court interpreter and translator will be filed).

Justice Negrón-García wrote, in *Hatton*, 134 P.R.Dec. 1001, 1005-06, 1011:

> [1] Let us begin by reiterating that the legal precepts that govern economic relations between private entities and the municipalities, are of great public interest and aspire to promote a healthy and upright/honorable public administration. In the end, "[t]he Good administration of a government is a virtue of democracy and part of a Good administration implies performing its duties as a buyer effectively, honestly and correctly so as to protect the interests and monies of the people said government represents." Marmol Company Inc. v. Administración de Servicios Generales, op. dated 29 June 1990. It is therefore necessary to avoid favoritism, corruption, waste, breach of trust, extravagance, carelessness, and the risks of noncompliance. For this reason, these rules cannot be dismissed, even in meritorious situations that demand a certain flexibility, such as the acquisition of goods and services in cases of emergency and other exceptional situations. Art. 8.02 21 L.P.R.A. s. 3252. In such cases, the municipality is exempted from the requirement of public auction but scrupulous adherence to the special procedures designed to allow flexibility is required, as well as the prevention of squandering, corruption, and cronyism. The courts must be vigilant and avoid the use of these procedures as a means to evade legal provisions aimed at assuring the healthiest public administration. Let us therefore examine the pertinent regulations in the Municipalities Organic Law, No. 146 of 18 June 1980.
>
> . . . .
>
> As in Morales v. Municipio de Toa Baja, [119 D.P.R. 682, 697 (1987)], plaintiff Hatton "knew or should have known the legal requirements. He had contracted with the Municipality before. The applicable statutory regulations seek to protect the public interest and not the contracting parties. Plaintiff contractor was no neophyte in matters of contracting public works with municipalities. His impoverishment is only attributable to him."

134 P.R.Dec. 1001, 1005-06, 1011. (footnote omitted) (no official translation available; partial translation made by this court's certified court interpreter and translator will be filed).

Finally, in the context of Section 1207 of the Civil Code, P.R. LAWS ANN. tit. 31, § 3372 (1930), the Supreme Court of Puerto Rico pristinely defined the concept of public order ("orden público") as a cause for the nullification of contracts executed in violation of that principle. *See De Jesús González v. Autoridad de Carreteras*, 148 P.R.Dec. 255 (1999). There, Justice Fuster-Berlingeri wrote:

> [1-4] As is known, on the subject of contracts, our legal system is characterized by granting a great deal of freedom of action to private individuals wishing to bind themselves, so recognizing the autonomous will of the contracting parties. Nevertheless, this autonomy is not without limits. See, Puig Peña, Compendio de Derecho Civil Español, Vol. III, p. 339 (1976). In dealing with this aspect of contracts, our Civil Code declares that "[t]he contracting parties may establish such pacts, clauses and conditions as they deem convenient, as long as they are not contrary to law, morals or public order." Article 1207 of the Puerto Rico Civil Code, 31 L.P.R.A. s. 3372. It is for this reason that, independently of the type of contract and the importance it may have for the contracting parties, a contract is deemed null and, therefore, nonexistent, if it is contrary to law, morals or public order. Morales v. Municipio de Toa Baja, 119 D.P.R. 682 (1987); In re: Pagán-Ayala, 117 D.P.R. 180 (1986); Sánchez-Rodríguez v. López-Jiménez, 116 D.P.R. 172 (1985); Asociación de Condóminos v. Seguros Arana, 106 D.P.R. 133 (1977); Franceschi v. Texaco P.R., Inc., 103 D.P.R. 759 (1975); Berrocales v. Tribunal Superior, 102 D.P.R. 224 (1974); C.R.U.V. v. Peña-Ubiles, 95 D.P.R. 311 (1967). In such cases of nullity, even a party that has benefitted from it may challenge a contract for being contrary to law, morals or public order. Rasa Eng. Corp. v. Daubón, 86 D.P.R. 193 (1962); Serra v. Salesian Society, 84 D.P.R. 322 (1961); Pagán v. Sucn. Padilla, 42 D.P.R. 968 (1931).
>
> [5-6] Pursuant to our duty to spell out for each [individual] case the general concepts of the legal system, Casiano, Jr. v. Borintex Mfg. Corp., opinion dated 14 April 1993, 133 D.P.R. _____, 93 J.T.S. 55, we have previously expressed ourselves *in extenso* on the concept of "public order." Hence, in

Hernández v. Méndez & Assoc. Dev. Corp., 105 D.P.R. 149, 153-154 (1976), we addressed the scope of said concept, precisely in relation to the validity of contracts. We stated at the time that:

"Public order" is the set of preeminent values that guides the existence and wellbeing of a society. The concept of public order groups and protects a predominant social interest due to its significance, the number of persons it affects, and the value of the rights it tends to protect. To a great extent, public order is the collection of regulations on morals and public ethics that are occasionally stated in the law, but that even absent such explicit legislative statement, constitute the guiding principles of wise government born from civilization and strengthened by culture, customs, ways of being, in sum, by the style of a society. Castán considers that customs as well as the law are manifestations of the prevailing social will.

The principle of the autonomous will of the contracting parties is set forth in Article 1207 of the Civil Code but within the established limitations. "Public order [says Manresa] does not signify [when speaking of contracts] keeping the physical public peace; it represents the public, social, and legal interest in private Law, what is permanent and essential to institutions, which, even when favoring an individual in whom the right lies concretely, cannot be left to his or her discretion....Legal evolution is unquestionably moving towards an ever-increasing infiltration of ethical and social elements, with an imperative tone that in a general sense has absolutely no disciplinary bearing on private law relations, imposing upon them a public nature at the expense of the principle of autonomous will, whereby its classic and broad field of action is losing ground." (Emphasis added) (Citations omitted).

[7] In reiterating this definition recently, we indicated that even when public order restricts personal will in the area of contracts, in the long run such restriction guarantees to a large degree the realization of said will. We pointed out that "[c]ertainly, public order is part of the public policy that allows and contributes to improved social coexistence." Unisys v. Ramallo Brothers, 128 D.P.R. 842, 851 (1991).

[8] This important concept is likewise understood in civil doctrine. Public order is considered to be an integral part of the public good and constitutes "the goal towards which the regulations of a determined legal system tend." J.A. Doral, La noción de orden público en el Derecho civil español, Pamplona, Ediciones Universidad de Navarra, S.A., 1967, at pp. 38-39.

. . . .

In his comprehensive study of what constitutes the normative concept of "public order" in the mentioned Civil Code article, published in Comentarios al Código Civil directed by M. Albaladejo and S. Díaz Albart, Rev. de Derecho Privado, Tome XVII, Vol. 1A (1993), pp. 100-296, A. Reverte-Navarro points out that public order is a limit against abuse in the exercise of autonomous will in contractual matters. He adds that "Public order is an **instrument of the effectiveness of values** ... a reflection of social convictions..." that acts as a legal instrument that is "progressive and revitalizing of the legal system, adjusting it to the social sense and reality of the time in which it should be applied." He also indicates that it incorporates "the fundamental principles upon which the legal system of a country is based." Ibid., at pp. 269-270. Citing a sentence by the Supreme Court of Spain dated 5 April 1966, the scholarly commentator says that:

"Public order summarizes and crystalizes in the legal system the basic criteria and collective beliefs, by condensing in said concept the set of public and private legal, political, financial, social, and even moral principles that constitute the foundation of a legal system at a given time." Ibid., p. 265.

In agreement with this eminent concept is Lacruz-Berdejo, for whom public order encompasses the general principles on which the laws are inspired and from which they derive. Elementos de Derecho Civil, Tome II, Vol. 2, Barcelona, 1987, p. 159.

[9-11] Our previous statements, as those of the cited doctrine, reflect the effectiveness of the concept of public order as a means to achieve a balance between the autonomous will of the parties and the indispensable protection of the common wellbeing. As we ourselves stated in Serra v. Salesian Society, supra, at p. 335, we as courts cannot assist litigants who have incurred in behaviors contrary to law, morals or public order. We cannot assist them in perfecting their transgression. **"We owe equity to the general community"**. For that reason, according to De Castro, supra, the doctrine has found in public order a dogmatic foundation to declare null those clauses that grossly infringe upon the proper order of the legal system, as is the case in contract clauses that are one-sided. For De Castro, it is consonant with the legal logic reviewed to consider one-sided contractual provisions invalid. [F.] De Castro, Notas sobre las limitaciones intrínsecas de la autonomía de la voluntad, IV Anuario de Derecho Civil 987], pp. 1057 and 1058 [1982].

. . . .

> [12] As a general norm, for purposes of applying the provisions and doctrines regarding contracts, the Commonwealth of Puerto Rico is considered a private contractor. When the State contracts, the contract must be interpreted as if it were a contract between two private individuals. Zequeira v. C.R.U.V., 83 D.P.R. 878, 880-881 (1967); Rodríguez v. Municipio, 75 D.P.R. 479, 494 (1953). That means that once the State executes a contract with a private person, both are obligated by the general norms related to contracts and their corresponding interpretations in light of our applicable rulings.
>
> [13-16] On the other hand, when contracting involves the use of public goods or funds, we have also insisted on the rigorous application of all of the regulations pertinent to contracting and the disbursement of those funds, so as to protect the interests and monies of the people. We have emphasized that the prudent management of public funds is steeped in interests of the public order. We have normatively highlighted the pressing need to avoid waste, extravagance, favoritism, and breach of trust in government contracts. See, Fernández & Gutiérrez v. Municipio de San Juan, opinion dated 19 March 1999, ___ D.P.R. ___, 99 JTS 31; Hatton v. Mun. de Ponce, opinion dated 12 January 1994, 134 D.P.R. ___, 94 JTS 2; Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864 (1990); Ocasio v. Alcalde de Maunabo, 121 D.P.R. 37, 54 (1988); Morales v. Municipio de Toa Baja, 119 D.P.R. 682, 693 (1987); Cancel v. Municipio de San Juan, 101 D.P.R. 296, 300 (1973); Justiniano v. E.L.A., 100 D.P.R. 334, 338 (1971). Certainly, when interpreting the contemporary sense of the provisions of the Civil Code requiring that contracts not be contrary to public order, we cannot ignore that in contracting by the State, the healthy and honorable administration of the funds of the people is of the highest public interest, and that every government entity is obligated to fully comply with the essence of the principle set forth in section 9 of Article VI of the Constitution of the Commonwealth of Puerto Rico, that public funds can only be used for legitimate public purposes. As we have stated before, all of the actions of the government are always bounded by the Constitution. The government as a contractor continues to be the government, and cannot act in a way that is at odds with the principles that embody the constitutional order. C.R.U.V. v. Peña Ubiles, supra, at pp. 315-317. The concept of "public order" from Article 1207 of the Civil Code, then, includes in its content not only the prohibition of abusive or one-sided contractual clauses discussed earlier, but also the constitutionally-based public policy that mandates the scrupulous use of public funds. The concept of "public order," as a collection and reflection of the general principles of Law, certainly encompasses the lofty legal

> value that several justices of this Court so clearly expressed in Autoridad de Energía Eléctrica y Otros v. P.N.P., 128 D.P.R. 294 (1991), (concurring vote by Associate Justice Negrón-García, joined by Associate Justices Rebollo-López y Andréu-García), when we ruled that public funds could not be used to pay the salaries of persons contracted by government agencies if said persons did not perform any work for said agencies:
>
> "[t]he undue or illegal disbursement of public funds—in its multiple forms, sometimes crude, other times sophisticated—are acts that are incompatible with the democratic system of government set forth in our Constitution and buttressed in the respect for human dignity and the monies of the people, as sole sovereign. **No matter what modalities are adopted or the hierarchy of the public servant involved, they are unacceptable.** In the final analysis, it is the people in general who are harmed, not only financially, but also morally... It is, therefore, the obligation of the courts to vindicate those fundamental values." (Emphasis added).

148 P.R.Dec. 255, 263-69. (footnotes omitted) (no official translation available; partial translation made by this court's certified court interpreter and translator will be filed).

The Lease Agreement in the case at bar is a long-term contract. No public bidding took place. The contract is, in that case, against public order and, therefore, null and void. No matter how the parties characterize the relationship, no matter the hierarchy of the institutions or parties involved, the contract is unacceptable. Cecort and its sole stockholder, a seasoned, sagacious, and competent businessman, knew or should have known about the long-term lease regulation and the requirements of public bidding. Each party must bear its loss. No unjust enrichment recourse is available. This is the end of this relationship, period.

**The OAT Timely Notified Cecort of Nonrenewal**

In addition, the OAT gave Cecort notice of nonrenewal, in writing, more than one year prior to the conclusion of the first ten-year term. The Sixth Clause of the Lease Agreement establishes that the lease was for ten years, beginning on the date of the handing over of "the leased area" to, and acceptance of those by, the OAT. The clause also states that if the OAT opted not to renew the Lease Agreement for another ten years, it needed to communicate notice of nonrenewal with at least 360 days in advance of termination of the first ten-year period.

Courts of competent jurisdiction have properly and correctly examined the definition of "the leased area" under the Lease Agreement and determined that the ten-year period started June 1, 2005, when the second of the two buildings was accepted by the OAT. (*Cecort Realty Development, Inc. v. Vélez-Colón*, No. KAC2014-0042 (P.R. Cts. of 1st Ins., S.J. Sup. Ct. May 23, 2014) (no official translation available; translation made by this court's certified court interpreter and translator will be filed).

This court agrees *in toto* with that holding, recently affirmed by the Puerto Rico Court of Appeals. *Cecort Realty Development, Inc. v. Vélez-Colón*, No. KLAN201401842 (P.R. Cir. Ct. of App. April 15, 2015) (Docket No. 31-1; no official translation available).

Under P.R. LAWS ANN. tit. 31, § 3471 "[i]f the terms of a contract are clear and leave no doubt as to the intensions of the contracting parties, the literal sense of its stipulations shall be observed." A court may not consider extrinsic evidence if it finds that the terms of an agreement are clear. *Borschow Hosp. & Med. Supplies, Inc. v. Cesar*

*Castillo, Inc.*, 96 F.3d 10, 15 (1st Cir. 1996). An agreement is clear when it can "be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation." *Catullo v. Metzner*, 834 F.2d 1075, 1079 (1st Cir. 1987) (internal citation omitted). Here, there is only one reasonable way to interpret the beginning of the ten-year term.

Pursuant to Section 1(a) of the Lease Agreement, the property designated as the "Leased Area" was comprised of the parcels along with the "[b]uildings to be constructed through private contract by THE LESSOR . . . . Said buildings will be used respectively by THE LESSEE to lodge the facilities of Court of Appeals Circuit [ ] and dependencies of the Office of Administration of the Courts [ ] with the capacity for seven hundred eight (708) vehicles." Pursuant to Section 4 of the Lease Agreement, the OAT was required to accept or reject the delivery of the Leased Area. Section Six states that the "effective term for the lease agreement [ ] will be ten (10) years as of the date of delivery by THE LESSOR and the acceptance by THE LESSEE of the **facilities**." (emphasis added).

Cecort argues that each of the buildings had its own starting point for the ten-year term. However, the only reasonable interpretation of the contract is to find that when the parties wrote "facilities," they meant facilities – plural – not "each respective facility" or something of that nature. Cecort attempts to use the May 24, 2001, letter from the then Administrative Director of the OAT to Cortés to show that it was the intent of the parties to treat each of the buildings separately, including their lease term beginning dates. However, having determined that the language of the contract is clear, the court cannot grant validity to such extrinsic evidence. Moreover, the letter mentions nothing about the

term of years. If it truly was the intent of the parties, and Cortés recognized a need for clarification, the parties could have added it to one of their four amendments – all of which came after the May 24, 2001, letter.

Regarding that May 24, 2001, letter, something must be said of its genesis and purpose. César Cortés testified that Scotia Bank, who financed the construction of the buildings for around $80,000,000, requested he obtain the letter from OAT for "clarification" purposes. Cortés was questioned on this, and no formal request of that nature by the Bank has been submitted for our review. Based on credibility assessments, we are convinced that the solicitation of that letter was a machination, a maneuver, a stratagem, to obtain from OAT a piece of paper that would eventually serve the purpose for which it was intended to be used in litigation. Cortés and Cecort knew or should have known about the dangerous path followed to make the contract fit under the short-term regulation, with no bidding. He was fully aware that it would be beneficial to obtain the second ten-year extension of the contract, and the May 24, 2001, letter helped to confuse or extrinsically attempt to change the contract language about when the first ten-year term would start and conclude. Cortés' overall credibility was marred, not only by this incident, but also by all the other instances here discussed where obviously credibility is lacking.

This judge has been sitting for thirty years and we have seen plenty of instances of mendacity. Having this man's testimony reminded me of my Family Law professor, Supreme Court Justice Raúl Serrano-Geyls, who wrote in *People v. Luciano Arroyo*, 83

D.P.R. 573 (1961), that judges are not expected to innocently believe what a regular bystander citizen would not believe. It is as simple as that.

**The Factual Scenario Continues – Guamá and Guayama**

The OAT accepted the building that would house the Court of Appeals on July 14, 2003. The OAT building was accepted on June 1, 2005. It is clear from the terms of the Lease Agreement that the "facilities" were accepted on June 1, 2005. Thus, the ten-year term began to run as of June 1, 2005, for both buildings, and OAT needed to provide notice of nonrenewal of the Lease Agreement by June 1, 2014.

Cecort argues that the OAT failed to timely provide notice of nonrenewal. On May 21, 2014, the OAT sent a letter by certified mail to Cecort at URB Hyde Park, 844 Calle Guamá, San Juan, Puerto Rico 00927, disclosing in writing the OAT's nonrenewal of the Lease Agreement for the next ten-year period set to begin on June 1, 2015. The United States Postal Service attempted delivery on May 24, 2014, and left two notices at the address for Cecort to claim the envelope. (Joint Exhibits 6 and 7.) Cecort did not pick up the certified mail from the Cupey Post Office Station and, on June 24, 2014, the USPS returned the envelope to the OAT. The OAT then sent a marshal to Cecort to deliver the returned certified mail envelope, a photocopy of the letter contained in the envelope, and another letter explaining the need to personally notify. Cortés accepted the three documents, but refused to sign an acknowledgment of his receipt for the certified mail letter. Cortés stated to the marshal, and reiterated during the federal hearing, that he was unable to confirm the address on the certified mail envelope and that mail is

recurrently and mistakenly delivered to the Cecort address that is meant for a different address, 844 Calle Guayama.

This court finds incredible and preposterous Cortés' testimony regarding the mistaken delivery. First, a review of the certified mail envelope, the green USPS Return Receipt for the item, and the USPS tracking information printout show, without any uncertainty, that this certified mail item was sent to Cecort at its office located at URB Hyde Park, 844 Calle Guamá, San Juan, Puerto Rico 00927. The photocopy of the certified mail envelope shows the "Return to Sender, Unclaimed, Unable to Forward" sticker covering half of the address; the original envelope is conveniently in the possession of Cortés, who failed to bring the item to the hearing. However, viewing the address in connection with the letter contained in the envelope, the address written on the USPS Return Receipt, and the zip code listed in the USPS tracking information sheet, all of the credible evidence is that the envelope was correctly addressed.

Additionally, Calle Guamá and Calle Guayama are neither in the same neighborhood nor the same zip code zone. The streets in Urbanization Hyde Park are all named after trees: Guamá, Las Marías, Flamboyanes, Palma Real, Las Caobas, and Los Mirtos. Cortés' bookkeeper added insult to injury on the credibility issue when she testified that Calle Guayama also exists in Urbanization Hyde Park; her statement is flat out incorrect. The court need not accept that one plus one equals seven simply because a witness says so. The court is allowed, even obligated, to use common sense and reality to determine credibility. Not only is Guayama not the name of a tree and, therefore, does not belong in Urb. Hyde Park, but it is located in Hato Rey Norte, a neighborhood where

the streets are named after cities in Puerto Rico: Guayama, Ciales, Utuado, Manatí, Lares, Patillas, Arecibo, Aguadilla, Coamo, San Sebastián, Mayagüez, Ponce, Juncos, Corozal, Trujillo Alto, Guaynabo, etc.

Next, Calle Guayama has the 00917 zip code, whereas Calle Guamá has the 00927 zip code. The address on the letter, USPS Return Receipt, and USPS tracking information printout all list the zip code for the delivery address as 00927.

Finally, Calle Guayama house numbers do not even reach 844; instead, they end somewhere in the 200s.[7]

When considering all of the evidence, there is no basis for Cecort's attempt to pull the wool over the court's eyes regarding the issue of whether the May 2014 notice was addressed appropriately. Prior to the May 2014 letter, Cecort was aware of the OAT's necessity to reevaluate the Lease Agreement as a result of the Comptroller's Report. Additionally, the OAT had notified Cecort at least as early as December 2013 that it understood the ten-year term did not begin until June 1, 2005. This court will not allow Cecort to benefit from its purposeful attempt to prevent service of the OAT's notification of nonrenewal. In the business of judging, we do not allow for that kind of machination, and the one who attempts it suffers the adverse effect of lack of credibility.

Accordingly, the court deems Cecort to have been notified, in writing, of OAT's nonrenewal of the Lease Agreement by May 27, 2014,[8] prior to the notice deadline of

[7] The court takes judicial notice of this fact pursuant to Fed. R. Evid. 201(b)(1).

[8] May 24, 2014, the attempted day of delivery of the certified mail letter, was a Saturday. Monday, May 26, 2014, was Memorial Day, and Cecort, as well as the USPS, was closed. The first day Cecort could have retrieved the certified mail was Tuesday, May 27, 2014. Also, there is evidence that in addition to the certified mail

June 1, 2014. Since the OAT timely cancelled the Lease Agreement, Cecort's claims for deprivation of property rights by entering into an agreement to move the OAT and the Court of Appeals out of Cecort's properties and by terminating the lease of **both** properties are dismissed on nullity and notice grounds.

**Excess Rent**

Cecort also alleges that Defendant Llompart-Zeno attempts to deprive it of its property rights maintaining a counter-claim against Cecort in the Puerto Rico Court of First Instance. The counter-claim, based on Article 1207 of the Civil Code, P.R. LAWS ANN. tit. 31., § 3372, seeks to declare the Lease Agreement contrary to public order and, therefore, null. (See Docket No. 46-2 at 14-15.) Should the Commonwealth Court agree with the OAT, the OAT demands reimbursement of the public funds paid in excess of the reasonable market value for similar rent. Here, Cecort seeks an injunction that would prevent the OAT from demanding the return of the excess rent in the counter-claim before the Commonwealth Court.

As addressed earlier, this court explicitly found that the Lease Agreement is null under P.R. LAWS ANN. tit. 31, § 3372 and the Puerto Rico case law interpreting it. We now turn to Cecort's request to prevent the OAT from seeking reimbursement of the excess rent.

There is no question that the Lease Agreement demands rent in excess of a reasonable market value for similar space. The Lease Agreement, Joint Exhibit 1, states,

---

letter, OAT sent the notice of non-renewal to Cecort via email – though no email was produced to verify this statement.

starting at page 12 of its final version, that the rent payable for usable areas started at $29.40/sq.ft., including the parking facility. The total area attributable to the Court of Appeals was 90,000 square feet. The OAT building was 110,000 square feet. The parking facility was 105,000 square feet, for a total rentable area of 305,000 square feet.

This generated an annual rent of $2,646,000, for the Court of Appeals building; $3,234,000 for the OAT building, and $3,087,000 for the parking facility. The total starting annual rent came to $8,967,000, plus property taxes reimbursable to Cecort up to 75%.

Amendments to the contract were negotiated and, at the end, when the final version of the lease agreement was signed, the Court of Appeals building would have six stories and 95,602 sq. ft. of rentable space, with 306 assigned parking spaces. The OAT building would have eight stories and a rentable square footage of 146,506 sq. ft. and 402 assigned parking spaces.

The annual rent for both towers and the parking facilities was set at $11,918,714 per year, as follows:

| OFFICE AREA | | | | PARKING AREA | | | |
|---|---|---|---|---|---|---|---|
| BUILDING | SQUARE FEET | PRICE PER SQ. FT. | AMOUNT | SQUARE FEET | PRICE PER SQ. FT. | AMOUNT | TOTAL AMOUNT |
| TA | 95,602 | $29.40 | $2,810,698 | 104,043 | $20 | $2,080,860 | $4,891,558 |
| OAT | 146,506 | 29.40 | 4,307.276 | 135,994 | 20 | 2,719,880 | 7,027,156 |
| | 242,108 | | $7,117,974 | 240,037 | | $4,800,740 | $11,918,714 |

In addition, the lessee would reimburse the lessor 75% of the property taxes paid by the Courts.

Another amendment was negotiated effective November 25, 2003. The yearly rent per square foot for the Court of Appeals was increased to $30.30/sq.ft. for office space, and $20.90/sq.ft. for parking space. As a result, the yearly rental for the Court of Appeals was increased to $5,071,240, or a 3.68% increase. Yearly combined rental increased to $12,098,396. The annual rent for the OAT facility remained the same for the first ten years.

The final contract document signed by the parties on May 22, 1998, was never the object of public bidding, and the Comptroller determined that, as a long-term contract, it had to go through the bidding process to be a valid contract. The Comptroller ordered a real-estate comparative analysis to determine if the rent agreed to was within market parameters. A civil engineer and real estate appraiser conducted a comparable rent study and the findings were the following:

| COMPARABLE BUILDING TABLE | | | | | |
|---|---|---|---|---|---|
| LOCATION | RENTABLE AREA (RA) | NO. OF PARKING SPACES ALLOWED PER EACH 1,000 SQ.FT. OF RA | BASIC RENT | CAM[1] PER SQ.FT. | CHARGE FOR EACH ADDITIONAL PARKING SPACE OVER THOSE INCLUDED IN THE BASIC RENT |
| A. San Patricio, Guaynabo | 207,823 | 4 | $22.00 | $7.97 | $80 |
| B. San Roberto Street,Río Piedras | 73,030 | 4.1 | 21.00 | $10.00 | Included |

| | | | | | |
|---|---|---|---|---|---|
| C.Chardón Street, Hato Rey | 209,488 | 4.5 | 19.50 | $8.42 | $85 to $125 |
| D. Los Romeros Ave., Montehiedra, San Juan | 177,880 | 4.9 | 19.00 | $8.52 | $55 to $75 |
| E. Ponce de León Ave., Hato Rey | 8,368 | 4.42 | 19.00 | $8.00 | $60 |
| | | Average Rent | | $20.10 | |

[1]Common area maintenance is composed of the expenses distributed among tenants for building maintenance. This figure is per square foot and is typically divided into expenses for common-element utilities and operational costs.

The expert concluded that, considering the market, comparable rentals, and the type of available facilities, the rental for the Court of Appeals and OAT buildings should have been in the neighborhood of $19.00 per square foot. The OAT and Court of Appeals buildings were paying significantly higher rents, not including the costs of water, electricity, sewer, garbage collection, and fumigation costs.

Regarding the parking facilities, the appraiser concluded that the going rate for parking spaces in the buildings quoted in the second table above would be in the range of $55 to $125 a month per space. However, the OAT-Court of Appeals 708 parking spaces were being leased at $576 a month per parking slot.

The Comptroller reaffirmed herself in the final report in the sense that excessive rent was agreed to and paid in excess of comparable rates in buildings located in comparable zones that had similar or better facilities than the Cecort property.

**What Happens to the Excess Rent?**

The commentators to Section 1207 of the Civil Code, P.R. LAWS ANN. tit. 31, § 3372, indicate that it is up to a court with jurisdiction over the contract itself – not over the constitutional violation – to determine an equitable remedy after determining that a contract is null. This remedy can go from zero recovery to some amount determined by the court with competent jurisdiction. *See generally* Manuel Albaladejo, COMENTARIOS AL CÓDIGO CIVIL Tome XV vol. 1, *comments to sec. 1124 of the Spanish Civil Code*, equivalent to sec. 1077 of the Puerto Rico Civil Code, P.R. LAWS ANN. tit. 31, § 3052 at 1171-1255; Albaladejo, op. at Tome XVII vol. 1A, *comments to sec. 1255 of the Spanish Civil Code*, equivalent to sec. 1255 of the Puerto Rico Civil Code, P.R. LAWS ANN. tit. 31, § 3524 at 100-295. *See also,* Manresa, CÓDIGO CIVIL ESPAÑOL, *comments to sec. 1,124 and 1255 of the Puerto Rico Civil Code*, Tome 8 vol. I at 348, and vol. II at 287.

There is no denying the dire state of the economy in Puerto Rico. On June 17, 2014, the Puerto Rico Legislature approved the *Government of the Commonwealth of Puerto Rico Special Fiscal and Operational Sustainability Act* (the "Act"), declaring a state of fiscal emergency for the island. Recently, as a result of the Act, Chief Justice Liana Fiol Matta announced several strict economic measures to deal with the $54 Million cut to the Judiciary Budget for the current fiscal year 2014-2015. Several courts will remain closed on specific dates/periods. Other courts will be permanently closed. Some courts will work on a reduced schedule.[9] Moreover, the announced $54 Million budget cut reduces the 2014-2015 fiscal budget for the judiciary by $25.8 Million less

[9] Source: www.ramajudicial.pr; Supreme Court Resolution EM-2015-01, dated March 24, 2015.

than the judiciary ran on during the 2013-2014 fiscal year. As recently as April 23, 2015, Puerto Rico government officials warned of a government shutdown within three months.[10] These are just a few of the recent commentaries on the Puerto Rico's economic state; other sources paint an even bleaker picture. (See *Characteristics of the Island's Maritime Trade and Possible Effects of Modifying the Jones Act*, United States Government Accountability Office Report GAO-13-260, March 2013; *Puerto Rico – Making an Assessment is Not Easy as the Day of Reckoning Nears*, Oppenheimer MuniViews, March 2015; *Report on the Competitiveness of Puerto Rico's Economy*, Federal Reserve Bank of New York, June 29, 2012;[11] *An Update on the Competitiveness of Puerto Rico's Economy*, Federal Reserve Bank of New York, July 31, 2014;[12] *Puerto Rico Electric Power Authority: Frequently Asked Questions About PREPA*, Moody's Investors Service, March 16, 2015). Simply put, the Government and the Judicial Branch are in dire economic straits. There is no money to pay the rent.

Although this court is not willing to decide this issue since it is properly before the Puerto Rico Court of First Instance, equities seems to suggest to leave the matter be and let the parties move on. Despite the depressed level of the government's financial state, it is the responsibility of the Superior Court to follow the law, and surely it will. When the system seems to be falling apart at the seams, courts of law should be counted on by the people to be fair, just, and reasonable. Here, the OAT knowingly entered into the contract; its attorneys reviewed the Lease Agreement and deemed it legal, and the budget

---

[10] http://www.reuters.com/article/2015/04/23/us-usa-puertorico-idUSKBN0ND2P620150423
[11] http://www.newyorkfed.org/regional/puertorico/index.html
[12] http://newyorkfed.org/outreach-and-education/puerto-rico/2014/report-main.html

and finance department reviewed it and determined there were sufficient funds to pay the rental amounts, both prior to the administrative director signing the contract. This court does not envy the position of the Superior Court in deciding this controversy, and we recognize the difficult position that a term judge is in when deciding whether and how to proceed in the case before it. However, it is with full faith in the integrity of Puerto Rico's judicial system that we resist the temptation to rule on this issue.

Although on paper the Complaint meets the jurisdictional threshold for federal jurisdiction, on the merits this is a matter squarely before the Superior Court, and we have no inclination to say more on the issue at this time. Cecort's request for declaratory injunction is DENIED.

**Qualified Immunity**

The doctrine of qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)) (internal quotation marks omitted). The doctrine provides "immunity from suit and not a mere defense to liability." *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (*citing Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

A plaintiff may overcome qualified immunity by first making out the violation of a constitutional right, and second, establishing that the "right was 'clearly established' at the time of the defendant's alleged violation." *Id.* at 268–69 (*quoting Pearson*, 555 U.S. at 815-16). The second prong of the two-step analysis is comprised of two parts: First,

whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right," and second, "whether in the specific context of the case, a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Mosher v. Nelson*, 589 F.3d 488, 493 (1st Cir. 2009) (internal quotation marks omitted) (citation omitted).

Defendant Llompart-Zeno became the Administrative Director of the OAT in October of 2014. Obviously, she cannot be held personally accountable for anything that happened between the OAT and Cecort prior to her involvement. Cecort alleges that Defendant Llompart-Zeno seeks to deprive Cecort of its property rights by demanding, in the counter-claim in the Puerto Rico Court of First Instance, that Cecort pay back the amount of rent deemed excessive over the last ten years and by cancelling the Lease Agreement and entering into a new lease with a third party to relocate the offices of the Court of Appeals and the OAT. We note, however, that Judge Llompart-Zeno did not sign the cancellation letter, her predecessor did. Cecort states that Defendant Llompart-Zeno's actions "are so stunningly arbitrary and capricious that they shock the conscience, and have been taken in such an imperious and outrageously high-handed manner that they evince an utter lack of respect for the Rule of Law." (Docket No. 1 at ¶ 51.) This court disagrees.

First, Cecort did not have a "clearly established" property right in the renewal of the contract. "A right is clearly established if when at the time the defendant acted he was on clear notice that what he was doing was unconstitutional." *Costa–Urena v. Segarra*, 590 F.3d 18, 29 (1st Cir. 2009) (citation omitted). As discussed above, the

Lease Agreement is null and void. Moreover, even if the Lease Agreement was valid, the OAT properly and timely terminated the contract. Because there is no property right, there can be no constitutional violation on the merits, although jurisdiction was well-pleaded in the Complaint.

Second, a reasonable person in Defendant Llompart-Zeno's position could have believed she was not violating Cecort's rights by relying on someone else's earlier decision to terminate the contract and by entering into a new lease over a government building. In fact, Defendant Llompart-Zeno's actions were simply proceeding under the terms of the Lease Agreement. On October 15, 2014, the parties received the order from the Superior Court agreeing with the OAT's understanding that the ten-year lease term began on June 1, 2005, once the second of the two properties was delivered and accepted by the OAT. The OAT's interpretation of the lease term under the contract is clearly reasonable.

Third, a reasonable person in Defendant Llompart-Zeno's position could have believed she was not violating Cecort's rights by not withdrawing the earlier counter-claim requesting the return of the excess rent paid over the last ten years. Defendant Llompart-Zeno is not even a defendant in the State Court charged with any wrong doing. As discussed above, the Comptroller's Report, along with the Supreme Court of Puerto Rico, determined that the rent charged by Cecort far exceeded the rent for similar buildings, and while some may differ, the overwhelming evidence supports the request for excess rent, the contract is a nullity, and its termination timely.

Accordingly, Defendant Llompart-Zeno is entitled to qualified immunity in her individual capacity.

## Conclusion

Wherefore, for the aforementioned reasons, Plaintiff Cecort Realty Development, Inc.'s Complaint is DISMISSED.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 24th day of April, 2015.

S/José Antonio Fusté
JOSE ANTONIO FUSTE
U. S. DISTRICT JUDGE